May it please the court, Stephan Police for Petitioner Ibrahim Mohamed. Before I begin, I'd like to reserve two minutes of my time for rebuttal, if I may. Okay, we'll try to help you keep track of time. And I'll say at the outset, there may be enough in this case that we misallocated the ten minutes. Whatever it takes, it takes. Thank you. Mohamed was previously tortured. And in this case, he was denied cat relief based on speculation, a reading mistake. How do you know he was previously tortured? The judge actually found that he was tortured, number one, and he found him to be credible. And the government never cross-appealed. Additionally, the immigration judge recited in his original decision the evidence of torture, which was scarring his testimony and his hearing deficit. Okay. Now, obviously, on a cat claim, you don't need, on account of a protected ground, all you need is torture. What evidence do we have as to why he was tortured the first time around? Evidence of why he was tortured the first time is that his family and his father in particular was involved in a political party, the Oromo Liberation Front. Mohamed originally was asked to be a child soldier because of his ethnicity. He declined, and that was the reason the government tortured him in Ethiopia, to try to convince him to go and be a child soldier. Okay. Well, isn't that quite a stretch to say that? I mean, he just didn't know how to serve. Isn't that it? He didn't want to fight in a war against Eritrea. That's correct. But this Court has previously said that torture as punishment for military desertion is still torture, and it's still grounds for cat relief. Oh, he was beaten. Yes. Torture is any intentional infliction of pain or suffering, and beatings would count. You mean the military can't beat someone if that's the discipline in the Army? No, in the Nuru case, N-U-R-U. What? In Nuru, a previous decision of this Court, the alien had deserted the military. I'm sorry. He had questioned his military leaders in the basis for a particular war. As a result, he was tortured, and the argument was similar there, that the military is justified in punishing people who desert. In fact, this Court said that under no circumstances may the government torture people, even to enforce their military rules. It's still torture. Now, he was granted asylum based on what happened to him in Ethiopia before, I'm assuming including and maybe even particularly focusing on the physical mistreatment, I'm avoiding for the moment the word torture, when he refused to serve. Do we know why he was granted asylum, just to say, do we have a record here as to he was granted asylum because he was recruited into the Army, because he was a Romo? I don't believe that's in the record except to the extent that there is evidence in the record that he was smuggled out of Ethiopia by the Aroma Liberation Front because of his torture there, because of his ethnicity. And there's additional evidence in the various declarations with the motion to reopen that they were granted asylum for that reason. Okay. Because it doesn't seem to me that he would have been granted asylum, not cavalry, but it doesn't make sense to me that he would have been granted asylum merely based upon his being recruited as a child soldier and the punishment he received when he refused to serve, because at the asylum there needed to be a protected ground. And the only one I can see is ethnicity. But we don't have the record. We're having to guess at this. I believe that there was information in the declarations from his father and brother that support that. Well, I mean, that's why I'm guessing that. But we don't have the record of the previous asylum proceeding. Correct. The previous asylum proceeding's record is out. Okay. Thank you. The speculation in the case was that because he's been out of the country a long time, the government would no longer be interested in him. There was actually no support for that in the record, and the record where there is information on that ground is directly to the contrary. The record says that 10 years after torturing particular suspects, they would still round them up and torture them again. The reading mistake was that the immigration judge believed that the Ethiopian government stepped in to protect the Oromos. In fact, the particular part of the record the immigration judge was citing to says they stepped in to prevent a clash between two different ethnic groups and actively went into Somalia to attack Oromos who were fleeing persecution in Ethiopia. The mistaken facts were that the government only cares about people who are involved in the Oromo Liberation Front. That's incorrect. They will attack and torture anyone who they suspect is a sympathizer with the Oromo Liberation Front. Let me come back to that point that you made a moment ago, and I should have picked it up at the time. The government asked a question in front of the IJ, are you aware of the Ethiopian government having stepped in to stop an attack? And it is pretty clear that what the government is referring to is the government stepping in to stop this clash between these two groups. The IJ then specifically mentions it and gives it specific names, that is to say naming the two groups. And you're quite right. I mean, I've looked at who these groups are and so on. This was not a clash between Oromo and the governing group. This was a clash between two groups, both of them outside the government. They might have been subgroups of the Oromo, but this simply does not support what the IJ said. On the other hand, that sentence in the IJ's report, using that as evidence as to why there is not sort of mistreatment of the Oromo by the government anymore, that's only one example in that paragraph. How do I deal with the other examples in that paragraph? Actually, the same page that the IJ was citing to also says that there were continued clashes between the Oromo and the Tigrayan government. Elsewhere in the record, there's also examples of the government clashing with the Oromo. There's the Human Rights Watch article that explains all the persecution of various people because of their Oromo ethnicity and because they were suspected OLF supporters. Additionally, there's the evidence from Professor Ali and from Muhammad's brother and father that explain that there are continued clashes. If we look at, I mean, we've got two questions in front of us. One of them is the direct petition for review, and the other one is petition for review for denial of the motion to reopen. If we look only at the first, just petition for review of the initial decision, what is there in the evidence in the record at that time that would compel us to say that there is a sufficient likelihood of torture? Well, first, the immigration judge's decision has to be based on some evidence in the record, and the particular reason he denied cat was because of the speculation that the Ethiopian government would no longer care about Muhammad since he's been gone. There was no support for that. But going to the second part, what evidence is there that he would be tortured now? Let me come back to that one. You say there's no support for the IJ speculation that the government would be interested in him if he were to return now after these 16 years or so. Is there specific evidence in the record that says they would be interested in him if he were to return now? Yes. The Ethiopian government is interested still in suspects that's previously rounded up. In a Human Rights Watch article in the record at page 484 and 485 of the record, there's evidence that 10 years later they will reround up the suspects they previously had. In addition with the first, the original evidence before the IJ was information from Professor Ali that they will continually check in on people that they've rounded up before, that they keep files on their people, that they will periodically round them up and torture them again. Then with the motion to reopen, there was additional evidence that because Muhammad's father and brother, well, Muhammad's father was the head of the provincial OLF government unit. Because of that and because of their continuing and notorious support for the OLF, that's another reason that the government would be specifically interested in Muhammad. That coupled with information that was originally before the IJ, that the Ethiopian government will detain individuals to compel their relatives to come back to Ethiopia. Okay, so part of my problem with the record the first time around, not yet to the motion to reopen, is that the testimony from Mr. Muhammad is pretty inconclusive. Now, I understand you're arguing, well, the reason it's inconclusive in terms of what's going to happen to him and why is that he's having mental difficulties, he's not being represented. But you're saying that if we look past his testimony, not something that contradicts it, but something that supplements it, if we look at the written materials in the record at that time, that is enough. Correct. There was additional evidentiary support before the immigration judge, and Muhammad had actually requested the immigration judge allow telephonic testimony from those witnesses, but the IJ apparently denied that request. So there could have been additional oral testimony at the hearing had the IJ permitted it. Does your client ever make a thing of the fact that the translator, the interpreter, is doing Amharic rather than his native language? Because that initial letter that he sent, or motion that he sends in, asking for telephonic testimony by his brother and by his father, says at the bottom, my best language is my native language, a variation of Oromo. Correct. No, he never does. But the IJ says your best language is Aramic and the translator is Aramic. Right. He never makes an issue of it, but I think that's tied to his mental competency, which is, as Dr. Ghazdeh explains, he'll never disagree with an authority figure. So if you look through the record, every time he's asked a question, his answer is either nonsensical or yes. Or whatever you want to do. Correct. I believe in that charge. Whatever you want to do, judge, I'll agree with. So he never does make an issue of it, even though the evidence shows that even hearing somebody talking in that language would cause him to black out or experience a schizophrenic episode or some other problem related to his competency. Okay. Why don't we hear from the government, and then we'll give you a chance to respond. Thank you. May it please the Court. Good morning, Your Honors. My name is Samia Nassim. I represent the government. Your Honors, Mr. Muhammad was convicted of a robbery with a weapon and sentenced to two and a half years in prison. He is statutorily ineligible for asylum and withholding because of his particularly serious crime. The only issue before the Court at this time is whether Mr. Muhammad failed to meet his high burden of establishing a clear probability of torture upon return to Ethiopia. Your Honors, Mr. Muhammad was given several opportunities to get an attorney. At his final opportunity, he, on his own volition, informed the Court at Administrative Record 625 that he would be representing himself. He also confirmed that he was comfortable representing himself. What does it say he's comfortable? Your Honor, on the same page, directly below, when he says he doesn't say I am comfortable, but the judge asks him, are you comfortable? And he says, yes, sir. He says yes, sir, a lot. He does. He does, Your Honor. However, I would argue, and I understand Mr. Pelis, Pelis, excuse me. I understand Mr. Pelis' argument that he would say yes to any authority figure. However, based on the transcript before the Court, it's very evident that he competently presented his case in front of the immigration judge. I have to say that this is different from whether there's a due process violation. But if I'm talking about how he presented his case in his testimony, if I had a lawyer representing me, presenting my case the way he presented it, I'd fire him. I understand, Your Honor. And he was certainly given several opportunities to seek an attorney, and he did speak with an attorney who ultimately was not able to represent him. It's also interesting to note, Your Honor, that according to Dr. Gazda's report, even if Mr. Muhammad had been represented by an attorney, he would see that attorney as an authority figure and the same symptoms would have been triggered. And that definitely falls on his issue of prejudice because it's hard for him to show prejudice where he would have had the same exact reaction to his own attorney and his case would have ultimately been the same. That stated, he did present a very good case on his behalf, being pro se, and I've seen several cases where very normal pro se litigants have done a poor job of representing themselves, and he represented himself quite, quite well. If you could turn from this to the motion to reopen and the board's decision. The board says he has not presented evidence that shows the result would have been different if he were permitted to go ahead. That's correct, Your Honor. Isn't that the way it's written? Essentially, Your Honor, the board considered all of the evidence that was before it. I'm asking, wasn't that what the board set as the standard? That's correct, Your Honor. The result would not be different. That's correct, Your Honor. Isn't that an incorrect statement of law? That's correct, Your Honor. So the board has made an error of law. Why shouldn't we reverse it? No, I'm sorry. I thought you said that was not an incorrect statement of law. I said is it, and you said it is. No, Your Honor. It's not an incorrect. Are you saying it's correct or incorrect? It's correct that the board considered the evidence and the board found that. No, no. The statement, he has not shown the result would be different. Is that the test? Right. Is that the test? Yes, that's it. He would have to show. You're saying that is the test? Yes, Your Honor. The test before. I think you're wrong in the law, because the test is, is there a likelihood? You don't have to show it will happen. You have to show it's likely. Right. That there's a likelihood that there would be a different outcome. And here the board says he didn't show it would be different. The board essentially is saying. No, wait a minute. Isn't that a misstatement of law? Your Honor, the board. Is it a misstatement of law? I would say, I would argue that it is not, Your Honor. Wait a minute. You can answer my question yes or no. Is it a misstatement of law to say the moving party for reopening must show the result will be different? Certainly, that is a misstatement of the law. It is a misstatement. That's correct. And it's a conclusion of the board's discussion of this issue. Your Honor, I believe the board. Why don't you admit error? Your Honor, according to my understanding and my review of the record. Admit error. I don't believe there was an error in this case by the board, Your Honor. You agree the law has been misstated. I believe that the board followed the law. Even if it didn't. No, wait a minute. The board states he must show the result will be different. You agree that is a misstatement of law. Correct? Your Honor, the board does not. No, I don't believe the board says that he must show that the outcome would be different. His conclusion is he has failed to show the law the result will be different. Is that a statement of law that's correct? I don't believe so, Your Honor. It's not a correct statement. I don't believe it's in the statement of the law. Oh, now, why isn't it? Because I believe that what the board is saying in its conclusion is that he's failed to show a likelihood that there would be a success on the merits. It says he's failed to show the result will be different. It doesn't use the... Yes, Your Honor. Do you want to go over the board decision and see if you can do better? Sure, Your Honor. Sure. Give me just one second. I mean, you don't have to come up and defend the board on every count if they've been in error. Your Honor, the board is saying that the Respondent, in this case Petitioner, has not shown, not demonstrated the result of his proceedings would have been different in the absence of the deficiencies that he alleges. Is that a correct statement of the law? Yes, Your Honor. I do believe that's a correct statement of the law, because he's only proceeded forward and shown that the outcome would have been the same. Now, wait a minute. You think the law is he must show the result will be different? He has to show that there's a likelihood of success on the merits. Okay. They don't say he hasn't shown a likelihood. They show he hasn't been different. It would have to come out the other way. That's the standard they hold him to. And that's an error of law. Well, you may not want to concede it, but that's at least the way I see it. Okay, Your Honor. You have made no answer to that. Your Honor, I do believe that the board on both the appeal appellate brief and also in the motion to reopen has considered all of the evidence before it, and they certainly did find that he did not show a likelihood of success on the merits. You've just repeated the standard that the board uses, and I have to say I don't want to hide where I am on this question. I think Judge Noonan has given you a proper statement of the law. They don't have to – in order to get – to show prejudice, my understanding of the law is he need only show a likelihood of a different result, not show that there would have been a different result. Certainly. And they do say in the beginning of their decision that they do conclude that he has not shown that it would – that the – he's not made his primary facet showing that it's more likely than not that he would be tortured upon removal to Ethiopia. They do indicate that there has to be – it has to be more likely than not that he would be tortured upon return to Ethiopia. That's the standard under the substantive question of cat relief. Right. That's not the standard as to whether there's prejudice. Yes, Your Honor. Right. Your Honor. Basically, to establish his due process claim, he would have had to show, and according to the board's decision, that the alleged errors in the proceedings prejudice his outcome. And then they go forward by saying that the respondent did not make the requisite showing of prejudice because he didn't show a likelihood of future torture in Ethiopia. It ties in that way. But, Your Honor, he certainly – he certainly did have an opportunity to present his evidence of whether he would be tortured, and it's very noteworthy that while he didn't present evidence that he was a member of the OLF during his immigration hearing, he did submit three affidavits, and none of the three affiants ever said he was a member of OLF. It's very noteworthy that when he went up for reopening, all three affiants suddenly added that statement into their – Are we going to decide the evidence? Are we going to weigh whether that fits with some other evidence? That's not our job. Your Honor, it is – it is certainly – it is certainly – it does reflect that there's an issue with his claim that he didn't have an opportunity to present his case because he did present his full case that was – and the immigration judge – Incompetent, yes. Yes. And the immigration judge certainly made a good decision based on all of the evidence on the record, including everything in the affidavits, and the affidavits were made by people who are not considered to be incompetent. Well, but, of course, the reason why he is likely to be tortured becomes irrelevant as a matter of law once it's a cat claim. That's correct. Provided he can show there is a likelihood of being tortured. That's correct. Now, the reason he may be tortured may be relevant to a cat claim because it may tell us how likely it is he will or will not be. That's correct. But the fact that he's an OLF member is irrelevant if there is sufficient evidence that he's likely to be tortured. Certainly, Your Honor. And there is not sufficient evidence of that. His family has been out of Ethiopia for 18 years at this time. They – he has not shown that he – it would be more likely than not that he would be tortured. Now, on that thought, I don't know the situation in Ethiopia, and I doubt that you do. That's correct. We have an expert saying this is the way the Ethiopian government operates. That's correct. And is there any rebuttal of Professor Alley on that point? There isn't. We don't have anyone rebutting Professor Alley or doubting us. Just what was being offered. He's got a good chance of being tortured. Certainly, Your Honor. It may be just a fantasy, but that's the evidence being offered. Certainly, Your Honor. But the standard he has to meet is a high burden of proving a clear probability. He has a high burden of proving a clear probability that he's going to be tortured, that it's more than likely than not that he will be tortured. If the only witness who apparently is an expert tells you it's likely, what do you have to refute it? Your Honor, it's his burden of establishing that – and while the witness has shown that his family has ties and that it's possible that he would encounter some kind of persecution upon return to Ethiopia, the witness has not shown that it's more likely than not that he would be tortured. It's a high burden that hasn't been met. But you're asking us to speculate by excluding the one expert who seems to know something about it. You don't want the government to take the trouble to have another hearing. And you say, well, send him off. He may not. I mean, you're sending him to a terrible fate if Professor Alley is right. You don't know and I don't know what will happen. Your Honor, he simply has failed to show that – the fact of the matter is that it is not the government's burden to show that he – it is his burden to show that it's more likely than not that he'll be tortured there. And while he has – Can I read you a passage? Sure. This is from Dr. Alley's letter. Sure. This is in the record the first time around. This is not Dr. Alley's submission in support of the motion to reopen. This is in the record the first time through. And I'm just reading from his letter. It's page four of his letter. He writes, I believe Mr. Muhammad, whose father and brothers are well-known OLF supporters, will not escape from the Ethiopian government's policy of persecuting suspected OLF supporters. Under these circumstances, to force Mr. Muhammad to return to Ethiopia would subject him to certain persecution. That's in the record the first time around from an expert. And I don't see anything that the government has to refute that the first time around. Or now. The only thing we have is the ALJ statement that that's speculation. Excuse me, the IJ statement. Right, right. What do you do with that statement in Mr. Alley's letter the first time through? Yes, I understand your point, Your Honor. Well, I understand the point. What do we do with it? I mean, does that mean Mr. Muhammad wins the first time through or he doesn't? If he doesn't win, why not? Well, Your Honor, certainly I understand that the report and what they say and how they are, the professor is indicating that there's a likelihood of torture. However, he says certain persecution. Sure, Your Honor. And it's understandable that Mr. Muhammad's brother and father were prominent people in Ethiopia 18 years ago. However, there has been an 18-year gap since then. And I do know that. But we have stuff in the record, again, the first time around, that they don't leave these things alone or these people alone merely because of the passage of time. It seems to me when you rely on 18 years, you're using your American common sense. Well, that's okay. That's a nice basis for speculation. But it's pure speculation. You're up against somebody who knows the country, who is qualified apparently as an expert, and who tells you something different. Now, you can't refuse the expert by your common sense American feeling about how time goes by. Your Honor, with due respect, I understand as well that the professor, you know, knows the country and has good experience with conditions in Ethiopia. However, nobody knows the chance that he's going to be tortured when he returns. And what we do have before us on the record is that it has been 18 years and that he did not present evidence of having been an OLF member in the first place. And there's no evidence from him that they are looking for him in Ethiopia or that they have attempted to contact him or they're even interested in him at all. All we have before us is what he's presented, and he has not shown a greater likelihood than not that he'll be tortured upon return to Ethiopia. You can say that if you don't believe Dr. Ali. Your Honor, I do believe Dr. Ali. Do you understand what I'm saying? If you do believe Dr. Ali, he has just said if he goes back, it is certain that he will be persecuted. Your Honor, and I believe that Dr. Ali's perspective comes from the fact that Mr. Mohammed's family was prominent 18 years ago and that we do have to consider that there's been a gap and that he hasn't presented evidence that they're looking for him at this time at all, that they don't have any interest in him at all. Okay. Okay. Barring any further questions from this Court, the government respectfully requests that this Court dismiss and deny in part and deny in part the petition for review. Okay. Thank you. Now, we've taken the government over. Response. Thank you. All right. First, I'd like to point out the Court has correctly identified the burden of prejudice in Mohammed v. Gonzalez, 400F3rd. No, I think we got that. Thank you. Moving on, one other point that the government made, I think, is a subtle attempt to shift the burden on the right-to-counsel issue, which is they argued he had a reasonable amount of time to find counsel. The government, in its brief, relies in part on a case called Biwat. In that case, this Court said one of the things you have to look at is what's the barrier that's preventing the alien from getting counsel? In this case, at the trial court level, ICE, the prosecuting agency, had records that would have explained what it was that was preventing Mohammed from getting counsel. They sat quietly and now would like to capitalize on it on appeal by saying that he had some length of time to find counsel. He's incarcerated, was incarcerated. Is he still incarcerated? He is still. And if we were to send this back, how long would this take before we could get a final adjudication on the assumption that he eventually wins, which, of course, is assuming we send it back and assuming he wins, how long are we talking about? I can't guess how long it would take for the immigration judge to hear this case. And then it goes up to the BIA? Correct. Then it comes up to us if he wins below and the government objects? Perhaps. And he's incarcerated the whole time? Yes, although under this Court's Casus Custrion case, there is now a mechanism to try to get him out of custody. Okay. Thank you. Thank you. Thank both sides for their argument. Mohammed v. Holder is now submitted for decision.
judges: Duffy, Noonan, Fletcher W.